Clayeo C. Arnold, California SBN 65070
carnold@justice4you.com
Brett E. Bitzer, California SBN 264736
bbitzer@justice4you.com
**CLAYEO C. ARNOLD, A PROFESSIONAL LAW**
**CORPORATION**
865 Howe Avenue
Sacramento, California 95825
916-924-3100 Telephone
916-924-1829 Facsimile

John A. Yanchunis, *Pro Hac Vice Admission Motion Pending*
jyanchunis@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: (813) 223-5505
Fax: (813) 223-5402

Attorneys for Plaintiffs,
Mark Foster and Akiko Foster

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Mark Foster and Akiko Foster, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| Essex Property Trust, Inc., | |
| Defendant. | |

Plaintiffs Mark Foster and Akiko Foster, individually and on behalf of all others similarly situated, upon personal knowledge of the facts pertaining to them and on information and belief as to all other matters, by and through their counsel, sue Defendant Essex Property Trust, Inc. ("Essex"). The claims and causes of action and the factual allegations upon which they are based is set forth below.

**INTRODUCTION**

1.    In connection with Essex's operation of apartment communities, Essex collected sensitive personal and financial information, including credit and debit card numbers ("PII") from Plaintiffs and Class Members who leased its apartments.  Unfortunately, Essex failed to reasonably maintain this information in a secure manner, including but not limited to its failure to encrypt the PII, in violation of its duties to do so and contrary to the reasonable expectations of consumers who leased apartments from Essex. Essex's failure violated minimum and reasonable industry-standard security measures, directly leading to and permitting a significant data security breach directly affecting thousands of consumers in the state of California.  Plaintiffs and the other members of the proposed class ("Class Members"), as a matter of law, were entitled to rely on Essex to reasonably secure their personal information.

2.    Essex  sustained one or more  security breaches to its computer systems, servers, and databases ("Network"), that otherwise would not have occurred, or would not have occurred with such severity, but for Essex's failure to maintain adequate, reasonable and industry-standard data security, a failure that represents gross disregard for the common law and other duties and obligations Essex was under.

3.    These security breaches (collectively, the "Data Breach"), placed the PII of Plaintiffs and Class Members. including customer names, mailing addresses, email addresses, private cell phone numbers, and birth dates, as well as credit and debit card numbers, employment information, including

salaries, social security numbers and other personal information (collectively, "PII"). in the hands of cyber criminals.

4.      Plaintiffs and Class Members were required to provide their PII to Essex when leasing apartments from Essex, and upon information and belief, Essex kept that PII on its Network in perpetuity, regardless of whether a consumer terminated his or her relationship with Essex.

5.      Further, on information and belief, Essex failed to adequately or properly separate Plaintiffs' and Class Members' PII, in effect allowing its bundling or commingling in such a fashion as to make the information available to third persons not authorized or intended by Plaintiffs and Class Members, and further aiding the unlawful access of the PII to unauthorized persons, including those initiating and completing the Data Breach.  Through such conduct, Essex allowed access to the PII to those who did not have a lawful and permissible purpose to receive it.

6.      Essex owed a legal duty to Plaintiffs and Class Members to maintain reasonable, adequate and industry-standard security measures to secure, protect and safeguard their PII stored on its Network.  This legal duty arose from the facts and circumstances surrounding Essex's solicitation and collection of the information, express promises by Essex (either directly or indirectly), and through the omissions, acts and representations of Essex. Essex breached these duties by failing to design and implement appropriate firewalls and computer systems, failing to properly and adequately encrypt data, and unnecessarily storing and retaining Plaintiffs' and Class Members' PII on its inadequately-protected Network. Essex did not act in a commercially reasonable manner.

7.      Essex knew or should have known that its inadequate security systems placed Essex at an increased risk for the Data Breach, which directly and proximately caused the theft of Plaintiffs' and Class Members' PII.

**PARTIES**

*Plaintiffs*

8.      Mark and Akiko Foster, husband and wife, reside in Menlo Park, California.   They presently reside in an apartment leased from Essex.  As a result of the Data Breach, Plaintiffs' PII was stolen by unknown third parties who made unauthorized charges on their credit cards, and exposed them to a greater risk of identity theft and fraud. Plaintiffs had a reasonable expectation that the Network was secure, were not told until after the Data Breach that the Network was not secure, and reasonably believed that Essex would take all reasonable measures to protect their PII from theft.

9.      Had Essex not concealed from the public, Plaintiffs and Class Members that it failed to employ reasonable, adequate, or industry-standard security measures to protect its customers' PII, Plaintiffs and Class Members would not have provided such PII to Essex, or would have insisted that their PII be destroyed and not maintained by Essex, or would have insisted that Essex implement security measures to prevent a breach of the type which occurred here.

*Defendant*

10.      Defendant, Essex, is a fully integrated real estate investment trust (REIT) that is publicly held and that invests in apartment communities along the West Coast of the United States. Since its start in 1971, it has continued to grow by developing, redeveloping and managing multifamily communities located in Northern California, Southern California, and Seattle Metro areas. As of the end of 2013, its portfolio consisted of full or partial ownership in 164 communities, aggregating 34,079 units, and eleven active development projects with 2,501 units in various stages of development.  Essex stock is traded on the New York Stock Exchange under the symbol "ESS", and its stock has a total market valuation of $13 Billion as of December 2, 2014.  Incorporated in the state of Maryland, it maintains its executive offices in Palo Alto, California.   The sheer number of the

apartments in its portfolio supports the allegations that thousands of consumers are in the putative class.

**JURISDICTION AND VENUE**

11.     The Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. §1332(d), because one of the Plaintiffs and the other Class members are of diverse citizenship from Defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), excluding interest and costs.

12.     Venue is proper in this District under 28 U.S.C. §1391 because Plaintiffs reside in this District, Defendant's executive offices are located in this District, and Defendant engaged in substantial conduct relevant to Plaintiffs' claims within this District and has caused harm to Class Members residing within this District.

**SUBSTANTIVE FACTUAL ALLEGATIONS**

**A. Essex Failed to Implement Basic Security Measures that Would have Prevented the Massive Data Breach**

13.     On information and belief, Essex did not implement reasonable, industry-standard, or appropriate security measures and knowingly, recklessly, or as a matter of gross negligence left Plaintiffs' and the other Class Members' PII stored on its Network vulnerable to cyber-attacks and data thefts.

14.     Despite Essex's duty to take reasonable steps to secure its Network, it in fact failed to take reasonable and adequate measures to protect Plaintiffs' and the other Class Members' PII stored on its Network.

15.     On information and belief, among Essex's failures in this respect was its failure to maintain adequate backups and/or redundant systems; failure to encrypt data and establish adequate firewalls to handle a server intrusion contingency; and its failure to provide prompt and adequate warnings of security breaches.

**B.  The Data Breach Caused by Essex's Improper Conduct Has Harmed Plaintiffs and the Other Class Members**

16.     It is well known and the subject of many media reports that PII data is highly coveted and a frequent target of hackers. PII data is often easily taken because it may be less protected and regulated than payment card data.

17.     Legitimate organizations and the criminal underground alike recognize the value in PII. Otherwise, they wouldn't pay for it or aggressively seek it. For example, in "one of 2013's largest breaches . . . not only did hackers compromise the [card holder data] of three million customers, they also took registration data from 38 million users."[1]  Similarly, in the Target data breach, in addition to Payment Card Industry (PCI) data pertaining to 40,000 credit and debit cards, hackers stole PII pertaining to 70,000 customers.

18.     Companies recognize that PII is a valuable asset, and Symantec Corporation has even created a software application that values a person's identity on the black market.

19.     PII is a valuable commodity.  A "cyber black-market" exists in which criminals openly post stolen credit card numbers, Social Security numbers, and other PII on a number of Internet websites.  As one industry report recognized, this "credit card black-market operates very much in the open" and a number of websites exist that offer stolen credit card numbers and associated credentials. The report went on to state:

> It is clear from the current state of the credit card black-market that cyber criminals can operate much too easily on the Internet.  They are not afraid to put out their email addresses, in some cases phone numbers and other credentials in their advertisements. It seems that the black market for cyber criminals is not underground at all.  In fact, it's very "in your face."

http://www.stopthehacker.com/2010/03/03/the-underground-credit-card-blackmarket/(last accessed on December 10, 2012).

---

[1] Verizon 2014 PCI Compliance Report, available at <http://www.nocash.info.ro/wp-content/uploads/2014/02/ Verizon_pci-report-2014.pdf> (hereafter "2014 Verizon Report"), at 54 (last visited Sept. 24, 2014).

20.    "Increasingly, criminals are using biographical data gained from multiple sources to perpetrate more and larger thefts." Id. PII data has been stolen and sold by the criminal underground on many occasions in the past, and the accounts of thefts and unauthorized access have been the subject of many media reports. One form of identity theft has been branded as "synthetic identity theft." It occurs when thieves create new identities by combining real and fake identifying information and then using those identities to open new accounts. "This is where they'll take your Social Security number, my name and address, someone else's birthday and they will combine them into the equivalent of a bionic person," said Adam Levin, chairman of IDT911, a company which helps businesses recover from identity theft. Synthetic identity theft is harder to unravel than traditional identity theft, experts said. "It's tougher than even the toughest identity theft cases to deal with because they can't necessarily peg it to any one person," Levin has said. In fact, the fraud might not be discovered until an account goes to collections and a collection agency researches the Social Security number.

21.    Unfortunately, and as will be alleged below, despite all of this publicly available knowledge of the continued compromises of PII in the hands of other third parties, Essex's approach at maintaining the privacy of Plaintiffs' and Class Members' PII was lackadaisical, cavalier, reckless, or at the very least, negligent.

22.    As a result of Essex's unreasonable, unfair, inadequate, and less than industry standard security for the Network, cyber-criminals now possess the PII of Plaintiffs and the other Class Members.  While credit card companies offer protection against unauthorized charges, the process is long, costly and frustrating.  Physical cards must be replaced, credit card information must be updated on all automatic payment accounts, and victims must add themselves to credit fraud watch lists which substantially impair victims' ability to obtain additional credit.  Immediate notice of the breach is essential to obtain the best protection afforded by these services.  As alleged above, Essex failed to

provide such immediate notice, thus further exacerbating the damages sustained by Plaintiffs and the other Class Members arising from the Data Breach.

23.    The information Essex compromised, including Plaintiffs' identifying information and/or other financial information, is "as good as gold" to identity thieves, in the words of the Federal Trade Commission ("FTC").   Identity theft occurs when someone uses another's PII, such as that person's name, address, credit card number, credit card expiration dates, and other information, without permission, to commit fraud or other crimes. The FTC estimates that as many as 10 million Americans have their identities stolen each year.

24.    As the FTC recognizes, once identity thieves have personal information, "they can drain your bank account, run up your credit cards, open new utility accounts, or get medical treatment on your health insurance."[2]

25.    According to Javelin Strategy and Research, "1 in 4 data breach notification recipients became a victim of identity fraud."[3]   Nearly half (46%) of consumers with a breached debit card became fraud victims within the same year.

26.    Identity thieves can use personal information such as that of Plaintiffs and Class Members, which Essex failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund. Some of this activity may not come to light for years. The IRS paid out 43.6 billion in potentially fraudulent returns in 2012, and the IRS identified

---

[2] FTC, Signs of Identity Theft, available at <http://www.consumer.ftc.gov/articles/ 0271-signs-identity-theft> (last visited Sept. 24, 2014).
[3] See 2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters, available at <www.javelinstrategy.com/brochure/ 276> (last visited Sept. 24, 2014) (the "2013 Identity Fraud Report").

more than 2.9 million incidents if identity theft in 2013. The IRS has described identity theft as the number one tax scam for 2014.

27.     Among other forms of fraud, identity thieves may get medical services using consumers' compromised personal information or commit any number of other frauds, such as obtaining a job, procuring housing or even giving false information to police during an arrest.

28.     It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."  In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims."

29.     Annual monetary losses from identity theft are in the billions of dollars.

30.     Javelin Strategy and Research reports that those losses increased to $21 billion in 2013.[4]

31.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[5]

---

[4] See 2013 Identity Fraud Report.
[5] GAO, Report to Congressional Requesters, at p.33 (June 2007), available at <http://www.gao.gov/new.items/d07737.pdf> (emphases added) (last visited Sept. 24, 2014).

32.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, whether or not such charges are ultimately reimbursed by the credit card companies.

33.     Information about Plaintiffs and the other Class Members may also be used to harass or stalk them.  And, the threat of "spear-phishing" – where details of a person's usage data can be used to tailor a "phishing" message that looks authentic, but is actually a ruse to get the consumer to divulge account information – is real.

34.     Indeed, at the time it disclosed the Data Breach, Essex cautioned its customers that the breach might lead to identity theft.

## CLASS ACTION ALLEGATIONS

35.     Plaintiffs bring this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. The class which they seek to represent is defined as:

> All persons in the United States who leased an apartment located in California from Essex in the last 4 years.

36.     Excluded from the Class is Defendant, including any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendant.

37.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can establish the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

38.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that joinder of all members would be impracticable.  While the exact number of Class Members is currently unknown to Plaintiffs, upon information provided in Essex's filing with the Securities and Exchange Commission, Plaintiffs allege that there are, at least, thousands of Class Members who were damaged by Essex's conduct described herein.  The names and addresses of Class Members are identifiable through documents maintained by Essex.  Ultimately, the sheer number of Class Members, who are geographically dispersed around the state of California, makes joinder of all members impracticable.

39.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**   This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

    a.   Whether Essex engaged in the wrongful conduct alleged herein;

    b.   Whether Essex owed a legal duty to Plaintiffs and  Class Members to exercise due care in collecting, storing and safeguarding their PII;

    c.   Whether Essex breached legal duties owed to Plaintiffs and Class Members to exercise due care in collecting, storing and safeguarding their PII;

    d.   Whether Essex's conduct violated the consumer protection laws of the state of California;

    e.   Whether Essex has been unjustly enriched through its acts and/or omissions alleged herein;

    f.   Whether Plaintiffs and Class Members are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

    g.   Whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to, injunctive relief and restitution.

40.     Essex engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of Class Members.  Similar or identical statutory and common law violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

41.     **Typicality – Federal Rules of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, Plaintiffs and Class Members were injured through the substantially uniform misconduct described above.  Plaintiffs herein are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses available to Essex that are unique to Plaintiffs.

42.     **Adequacy of Representation – Federal Rules of Civil Procedure 23(a)(4).**  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs will prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

43.     **Superiority – Federal Rules of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this matter as a class action.  The damages, harm, or other financial detriment suffered individually by Plaintiffs and  Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Essex, making it impracticable for Class Members to individually seek redress for Essex's wrongful conduct.  Even if Class Members could afford individual litigation, the court system could not.  Individualized litigation would create a potential for inconsistent or contradictory judgments, and increase the delay and expense to all parties and the court system.  By

contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CLAIMS ASSERTED

### COUNT I

### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200 *et seq.*

44.     Plaintiffs, individually and on behalf of Class Members, reallege and incorporate by reference the allegations contained in paragraphs 1 – 43 above as though fully stated herein.

45.     Essex engaged in unfair, unlawful and fraudulent business practices in violation of the California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*

46.     By reason of the conduct alleged herein, Essex engaged in unlawful, unfair and deceptive practices within the meaning of the UCL.  The conduct alleged herein is a "business practice" within the meaning of the UCL.

47.     Essex violated the UCL by failing to take reasonable precautions to protect Class Members' PII as alleged.  Further, Essex implicitly promised to take "reasonable measures" to protect Class Members' PII against breaches in security, but failed to do so.  In violation of industry standards, Essex used weak or no encryption and failed to adequately install and maintain firewalls, as alleged more fully in this Complaint.  Essex violated consumer expectations to safeguard PII and failed to tell consumers that it did not have reasonable and adequate safeguards in place to protect Class Members' PII.

48.     Essex also violated the UCL by failing to immediately notify Class Members of the Data Breach.  If Class Members had been notified in an appropriate fashion, they could have taken precautions to safeguard their PII.

49.     Essex's acts, omissions, and misrepresentations as alleged herein were unlawful and in violation of, *inter alia,* Cal. Bus. & Prof. Code § 17500 *et seq., *Cal. Civ. Code § 1750 *et seq.*, Cal. Civ. Code § 1798.80 *et seq.,* and its own Privacy Policy.

50.     Essex's actions also constitute "unfair" business acts or practices because, as alleged above, *inter alia*, Defendant omitted material facts regarding its Network, and thereby offended public policy and engaged in immoral, unethical, oppressive and unscrupulous activities which caused substantial injury to consumers, including Class Members.  The gravity of Essex's conduct outweighs any potential benefits attributable to such conduct.   In addition, there were reasonably available alternatives to Essex's conduct described herein to further Essex's legitimate business interests, other than.  Further, Essex has violated public policy, as expressed through laws and regulations, to adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel and other information in a manner which is fair and equitable to the consumer with regard to confidentiality and proper utilization of such information, in violation of the unfairness prong of the UCL.

51.     Essex's representations and other conduct induced Plaintiffs and Class Members to entrust Essex to maintain their PII which Essex required that they provide to Essex in order to lease apartments.  But for these deceptive acts and business practices, Plaintiffs and Class Members would not have leased apartments from Essex.

52.     Plaintiffs and Class Members suffered injury in fact and lost money and/or their valuable PII as the result of Essex's failure to secure their personal information that was stored on Essex's servers.  As a result of the Data Breach, Plaintiffs' and Class Members' PII was compromised, their PII was obtained by a third party without their consent, and in addition to the damages already suffered, Plaintiffs and Class Members face years of financial losses from the misuse of their PII and from identity theft.

53.     As a result of Essex's wrongful conduct, Plaintiffs and Class Members are entitled to restitution and injunctive relief.

## COUNT II

### Violation of California's Consumers Legal Remedies Act ("CLRA") Cal. Civ. Code § 1750 *et seq.*

54.     Plaintiffs, individually and on behalf of Class Members, reallege and incorporate by reference the allegations contained in paragraphs 1 – 43 above as though fully stated herein.

55.     California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.*,(CLRA) was enacted to protect consumers against unfair and deceptive business practices.  The CLRA extends to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.  Essex's acts, omissions, representations and practices as described herein fall within the CLRA because Essex offers a service as defined in the CLRA and because the design, development and marketing of Essex's services and Network are intended to and did result in sales of goods to consumers.

56.     Plaintiffs and Class Members are consumers within the meaning of Cal. Civ. Code §1761(d).

57.     Essex's acts, omissions, misrepresentations and practices were and are likely to deceive consumers. By omitting key information about the safety and security of the Network and deceptively representing that it adequately maintained such information, Essex violated the CLRA. Essex had exclusive knowledge of undisclosed material facts, namely, that its Network was defective and/or unsecure, and withheld that knowledge from Class Members.

58.     Essex's acts, omissions, misrepresentations and practices alleged herein violated the following provisions of the CLRA, which provide, in relevant part, that:

a.      The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

(5)   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . . .

(7) Representing that goods or services are of a particular standard, quality, or grade . . . if they are of another.

(9) Advertising goods or services with intent not to sell them as advertised.

(14) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.

(16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

For purposes of the CLRA, omissions are actionable along with representations.

59.     Essex stored Class Members' PII on its Network. Essex implicitly represented to Class Members that its Network was secure and that their PII would remain private.

60.     Essex knew or should have known that it did not employ reasonable measures that would have kept Class Members' PII secure and prevented the loss or misuse of their PII. For example, Essex failed to use a sufficient encryption code to protect Class Members' financial information and failed to employ any encryption to protect other personal information, such as email addresses and passwords.

61.     Essex's deceptive acts and business practices induced Class Members to provide their PII, including credit card and debit card information.  But for these deceptive acts and business practices, Class Members would not have provided such sensitive information to Essex and/or would not have leased its apartments.

16

62.     Essex's representations that the PII of Plaintiffs and Class Members was secure and protected while in Essex's possession were facts that reasonable persons could be expected to rely upon when deciding whether to lease apartments from Essex.

63.     Class Members were harmed as the result of Essex's violations of the CLRA because their PII was compromised, placing them at a greater risk of identity theft, and their PII was used by unknown third parties to their financial detriment.

64.     Class Members suffered injury in fact and lost money or property as a result of Essex's failure to secure their PII.

65.     Essex's conduct alleged herein was oppressive, fraudulent and/or malicious.

66.     Pursuant to Cal. Civ. Code §1782, on or about November 6, 2014, Plaintiffs mailed Essex notice in writing notice of the particular violations of the CLRA and demanded that Essex rectify the actions described above by providing complete monetary relief, providing full disclosure of the breach and Essex's investigations into the breach. Essex failed to rectify the problems associated with the actions detailed above.

67.     Pursuant to Cal Civ. Code §§ 1780 and 1781, Plaintiffs and the Class Members hereby request certification of Plaintiff's Class, injunctive relief, and attorneys' fees, costs and expenses.

## COUNT III

### Violation of Cal. Civ. Code § 1798.80 et seq.

68.     Plaintiffs, individually and on behalf of Class Members, reallege and incorporate by reference the allegations contained in paragraphs 1-43 above as though fully stated herein.

69.     Section 1798.82 of the California Civil Code provides, in pertinent part, as follows:

(a) Any person or business that conducts business in California, and that owns or licenses computerized data that includes personal information, shall disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person. The disclosure shall be made in the most expedient time

possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subdivision (c), or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system.

(b) Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person.

(c) The notification required by this section may be delayed if a law enforcement agency determines that the notification will impede a criminal investigation. The notification required by this section shall be made after the law enforcement agency determines that it will not compromise the investigation.

(d) Any person or business that is required to issue a security breach notification pursuant to this section shall meet all of the following requirements:

(1) The security breach notification shall be written in plain language.

(2) The security breach notification shall include, at a minimum, the following information:

(A) The name and contact information of the reporting person or business subject to this section.

(B) A list of the types of personal information that were or are reasonably believed to have been the subject of a breach.

(C) If the information is possible to determine at the time the notice is provided, then any of the following: (i) the date of the breach, (ii) the estimated date of the breach, or (iii) the date range within which the breach occurred. The notification shall also include the date of the notice.

(D) Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided.

(E) A general description of the breach incident, if that information is possible to determine at the time the notice is provided.

(F) The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a social

security number or a driver's license or California identification card number.

\* \* \*

(f) Any person or business that is required to issue a security breach notification pursuant to this section to more than 500 California residents as a result of a single breach of the security system shall electronically submit a single sample copy of that security breach notification, excluding any personally identifiable information, to the Attorney General. A single sample copy of a security breach notification shall not be deemed to be within subdivision (f) of Section 6254 of the Government Code.

(g) For purposes of this section, "breach of the security of the system" means unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of personal information maintained by the person or business. Good faith acquisition of personal information by an employee or agent of the person or business for the purposes of the person or business is not a breach of the security of the system, provided that the personal information is not used or subject to further unauthorized disclosure.

70. The Data Breach constituted a "breach of the security system" of Essex.

71. Essex unreasonably delayed informing anyone about the breach of security of Class Members' Personal Information after Essex knew the Data Breach had occurred.

72. Essex failed to disclose to Class Members, without unreasonable delay, and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, PII when they knew or reasonably believed such information had been compromised.

73. Upon information and belief, no law enforcement agency instructed Essex that notification to Class Members would impede investigation.

74. Pursuant to Section 1798.84 of the California Civil Code:

(a) Any waiver of a provision of this title is contrary to public policy and is void and unenforceable.

(b) Any customer injured by a violation of this title may institute a civil action to recover damages.

(c) In addition, for a willful, intentional, or reckless violation of Section 1798.83, a customer may recover a civil penalty not to exceed three thousand dollars ($3,000)per violation;

otherwise, the customer may recover a civil penalty of up to five hundred dollars ($500) per violation for a violation of Section 1798.83.

*     *     *

(e) Any business that violates, proposes to violate, or has violated this title may be enjoined.

75.    As a result of Essex's violation of Cal. Civ. Code § 1798.82, Class Members incurred economic damages relating to expenses for credit monitoring and the loss of use and value of Essex services.

76.    Plaintiffs, individually and on behalf of Class Members, seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to: (a) damages suffered by Class Members as alleged above; (b) statutory damages for Essex's willful, intentional, and/or reckless violation of Cal. Civ. Code § 1798.83; and (c) equitable relief.

77.    Plaintiffs, individually and on behalf of the other Class Members, also seek reasonable attorneys' fees and costs under Cal. Civ. Code §1798.84(g).

<h2 style="text-align:center">COUNT IV</h2>

<h3 style="text-align:center">Negligence under California Law</h3>

78.    Plaintiffs, individually and on behalf of Class Members, reallege and incorporate by reference the allegations contained in paragraphs 1-43 above as though fully stated herein.

79.    Essex owed a duty to Plaintiffs and Class Members to exercise reasonable care in safeguarding and protecting their PII in its possession from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing Essex's security systems to ensure that Plaintiffs' and Class Members' PII in Essex's possession was adequately secured and protected. Essex further had a duty to implement processes that would detect a breach of its security system in a timely manner.

80.    Essex had a duty to timely disclose to Plaintiffs and Class Members that their PII had been or was reasonably believed to have been compromised. Timely disclosure was appropriate so

that, among other things, Plaintiffs and Class Members could take appropriate measures to avoid unauthorized charges to their credit/debit card accounts, cancel or change usernames and passwords on compromised accounts, and monitor their account information and credit reports for fraudulent activity.

81.     Essex breached is duty to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII in its possession by failing to adopt, implement, and maintain adequate security measures to safeguard their PII; failing to encrypt the PII; failing to adequately monitor the security of the Network; allowing unauthorized access to their PII stored on the Network; and failing to recognize in a timely manner that the Network had been breached.

82.     Essex breached its duty to timely disclose that Plaintiffs' and Class Members' PII in its possession had been, or was reasonably believed to have been, stolen or compromised.

83.     Essex's failure to comply with industry regulations and the delay between the date of intrusion and the date Essex informed customers of the Data Breach further evidence Essex's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII in its possession.

84.     But for Essex's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their PII would not have been compromised.

85.     The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Essex's failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII within its possession. Essex knew or should have known that its systems and technologies for processing and securing Plaintiffs' and Class Members' PII had security vulnerabilities.

86.     A special relationship exists between the parties that allows for the recovery of economic loss in this case, as articulated herein.

87.     It was foreseeable that Plaintiffs and Class Members would suffer harm if Essex did not provide adequate, reasonable, and industry-standard security, because Essex collected and retained sensitive Personal Information from Plaintiffs and Class Members.

88.     As described herein, Plaintiffs and Class Members suffered injuries as a result of the Data Breach.

89.     These injuries were a direct result of Essex's lack of adequate, reasonable and industry-standard security measures. Had Essex implemented adequate, reasonable and industry- standard security measures, Plaintiffs and Class Members would not have suffered the injuries alleged, as the Data Breach would likely not have occurred.

90.     As a result of Essex's negligence, Plaintiffs and Class Members incurred damages.

## COUNT V

### Breach of Duty of Good Faith and Fair Dealing

91.     Plaintiffs, individually and on behalf of Class Members, reallege and incorporate by reference the allegations contained in paragraphs 1-43 above as though fully stated herein.

92.     Plaintiffs and Class Members entered into written lease agreements for the lease of their respective apartment units.  As alleged earlier, Plaintiffs and Class Members were required to provide their PII to Essex in connection with the lease transactions.

93.     In every contract or agreement there is an implied promise of good faith and fair dealing.

94.     Plaintiffs and Class Members allege Essex violated the duty to act fairly and in good faith by failing to safeguard and protect Plaintiffs' and Class Members' PII in its possession by failing to adopt, implement, and maintain adequate security measures to safeguard their PII; failing to encrypt the PII; failing to adequately monitor the security of the Network; allowing unauthorized access to

their PII stored on the Network; and failing to recognize in a timely manner that the Network had been breached.

95.     All conditions required for the commencement of this case against Essex has been performed, has occurred or been excused.

96.     Essex unfairly interfered with Plaintiffs' and Class Members' right to receive the benefits of the contract, which included the right to have their PII secure and protected from loss to unauthorized third parties. As a result of Essex's breach as set forth herein. Plaintiffs and Class members have been damaged.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of Class Members, respectfully request that this Court enter an Order:

A.     Certifying the Class under Federal Rule of Civil Procedure 23(a) and 23(b)(2) and (3) and (c)(4), appointing Plaintiffs as Class Representatives, and appointing their undersigned counsel as Class Counsel;

B.     Finding that Essex's conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

C.     Enjoining Essex from engaging in the negligent, deceptive, unfair, and unlawful business practices alleged herein;

D.     Awarding Plaintiffs and the other Class Members actual, compensatory, and consequential damages;

E.     Awarding Plaintiffs and the other Class Members restitution and disgorgement;

F.     Requiring Essex to provide appropriate credit monitoring and identity-theft prevention services to Plaintiffs and the other Class Members;

G.     Awarding Plaintiffs and Class Members exemplary damages, should the finder of fact determine that Essex acted with oppression, fraud, and/or malice;

H.    Awarding Plaintiffs and Class Members all applicable statutory damages in the amounts so provided by said statutes;

I.    Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest;

J.    Awarding Plaintiffs and Class Members reasonable attorneys' fees and costs; and

K.    Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Consolidated Class Action Complaint so triable.

Respectfully submitted,

Clayeo C. Arnold, California SBN 65070
carnold@justice4you.com
Brett E. Bitzer, California SBN 264736
bbitzer@justice4you.com
**CLAYEO C. ARNOLD, A PROFESSIONAL LAW CORPORATION**
865 Howe Avenue
Sacramento, California 95825
916-924-3100 Telephone
916-924-1829 Facsimile

John A. Yanchunis, Esq. (*pro hac vice pending*)
Florida Bar No.: 324681
Morgan & Morgan
Complex Litigation Group
201 North Franklin Street, 7th Floor
Tampa, FL 3360
813.223.5505 (office)
813.275.9295 (fax)